PEOPLE OF the STATE OF CALIFORNIA, Plaintiff-Appellant,

v.

Kathryn Isabella MESA, Defendant-Appellee.

PEOPLE OF the STATE OF CALIFORNIA, Plaintiff-Appellant,

v.

Shabbir A. EBRAHIM, a/k/a Shabbir Azam, Defendant-Appellee.

Nos. 86–1525, 86–1500.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 13, 1987.

Decided March 26, 1987.

Before MERRILL, NELSON and NOONAN, Circuit Judges.

MERRILL, Circuit Judge:

These two cases[1] pose a fascinating issue of federalism: can a federal postal employee remove his state criminal prosecution to federal court when no issue of federal law will arise at trial and when the only federal component of the case is that he was on duty when the relevant acts allegedly occurred?

Mesa and Ebrahim are United States mail carriers charged with violations of state law[2] that allegedly occurred while they were on duty driving their mail trucks. Both defendants removed their cases to federal court pursuant to 28 U.S.C. § 1442(a)(1), which allows removal by federal officers acting "under color of [their] office."[3] The district court denied California's motions to remand the cases to state court. Although neither defendant has yet been tried in federal court, California asks this court—either by way of interlocutory appeal or a writ of mandamus—to order the cases remanded to state court. We find that the collateral order doctrine does not permit interlocutory review in these cases. Rather, we hold that a writ of mandamus is appropriate to compel the district court to remand these cases to state court.

## I.  COLLATERAL ORDER DOCTRINE

This court's appellate jurisdiction is generally limited to review of "final decisions of the district courts." 28 U.S.C. § 1291.

Leo Himmelsbach and Kenneth Rosenblatt, San Jose, Cal., for plaintiff-appellant.

Richard K. Willard, Joseph P. Russoniello, Barbara L. Herwig and Mack A. Player, Washington, D.C., for defendant-appellee.

1. Because they raise the same legal issues, we order that these two cases be consolidated on appeal.

2. Mesa was accused of misdemeanor-manslaughter after her mail truck collided with and killed a bicyclist. Ebrahim received a traffic ticket for speeding and failing to yield after his mail truck collided with a police car.

3. In pertinent part, the statute states:

**§ 1442. Federal officers sued or prosecuted**

· (a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to [federal district court]:

(1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1) (1982).

The collateral order doctrine, established in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), is a narrow exception to the final judgment rule. In criminal cases, the exception permits appeal of interlocutory orders that satisfy three requirements. First, the order must " 'constitute[ ] a complete, formal, and, in the trial court, final rejection of' the claim the order addresses." *United States v. Harper*, 729 F.2d 1216, 1220 (9th Cir.1984) (quoting *Abney v. United States*, 431 U.S. 651, 659, 97 S.Ct. 2034, 2040, 52 L.Ed.2d 651 (1977)). Second, the claim must be " 'collateral to, and separable from' " the issue of the defendant's guilt. *Id.* And third, the order must involve rights that "would be irretrievably lost if review were postponed until trial is completed." *Flanagan v. United States*, 465 U.S. 259, 266, 104 S.Ct. 1051, 1055, 79 L.Ed.2d 288 (1984). The Supreme Court has interpreted the collateral order doctrine with the "utmost strictness" in criminal cases. *Id.* at 265.[4]

■ Although the orders at issue here clearly satisfy the second requirement, the first and third requirements are not met. First, the orders denying the motions to remand to state court are not final rejections of the state's request for remand because 28 U.S.C. § 1447(c) (1982) provides that the district court shall remand the case "[i]f at any time before final judgment it appears that the case was removed improvidently and without jurisdiction." Hence, the district court's initial decisions to deny the motions did not preclude the possibility of a remand. In addition, the third requirement is not clearly met because, as is discussed more fully in the following section, the state may appeal an acquittal on the ground that the case was

improperly removed. Therefore, review of the denial of the motions to remand under the collateral order doctrine is inappropriate in these cases.

## II. MANDAMUS

■ This court has the power to issue a writ of mandamus in aid of its appellate jurisdiction. *See Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25, 63 S.Ct. 938, 941, 87 L.Ed.2d 1185 (1943); 28 U.S.C. § 1651 (1982). That power unquestionably exists here, because this court would have jurisdiction over appeals from final judgments in these cases. *See United States v. Harper*, 729 F.2d 1216, 1221 (9th Cir.1984).

■ Because of the strong policy against piecemeal review embodied in the final judgment rule (particularly in criminal cases), the question is whether discretionary review by way of a writ of mandamus is appropriate. As a general matter, the Supreme Court has described the writ as "an 'extraordinary remedy' that should only be invoked in 'exceptional circumstances.' " *Id.* (quoting *Will v. United States*, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967)).

Nonetheless, the Supreme Court has approved appellate grants of mandamus in cases very similar to those before us. In *Maryland v. Soper* (No. 1), 270 U.S. 9, 46 S.Ct. 185, 70 L.Ed. 449 (1926), four prohibition agents and their chauffeur sought to remove their state murder prosecutions to federal court under a statutory predecessor of 28 U.S.C. § 1442, and the district judge denied Maryland's motion to quash the petition for removal. Under these "exceptional circumstances," *id.* at 30, 46 S.Ct. at 189, the Supreme Court held that mandamus was appropriate because of the del-

---

**4.** The Supreme Court has found three kinds of orders appealable under the collateral order doctrine as applied in criminal cases. *See Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979) (reviewing before trial a Congressman's right under the Speech and Debate Clause not to be questioned about certain legislative activities); *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (reviewing before trial a defendant's right not to be tried in violation of the Double Jeopardy

Clause); *Stack v. Boyle*, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951) (reviewing Eighth Amendment claim of excessive bail, which would become moot after trial); *accord United States v. Claiborne*, 727 F.2d 842 (9th Cir.) (allowing direct appeal by federal judge arguing that he had a right not to be tried for tax evasion until constitutionally removed from office), *cert. denied*, 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984).

icate issue of federal-state relations raised: "the jurisdiction of the courts of a State to try offenses against its own laws and in violation of its own peace and dignity is wrested from it by the order of an inferior federal court." *Id.* at 29, 46 S.Ct. at 189; *cf. Kollsman v. City of Los Angeles,* 737 F.2d 830, 833 n. 5 (9th Cir.1984) (noting that a district court's decision not to abstain under the *Pullman* doctrine is reviewable through mandamus), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). The Court also noted that mandamus was the only procedure whereby the state could obtain appellate review. *See Soper,* 270 U.S. at 30, 46 S.Ct. at 189. In other cases, the Supreme Court has taken a similar approach to mandamus in criminal removal cases. *Roche v. Evaporated Milk Ass'n,* 319 U.S. 21, 31 n. 5, 63 S.Ct. 938, 944 n. 5, 87 L.Ed. 1185 (1943); *Colorado v. Symes,* 286 U.S. 510, 52 S.Ct. 635, 76 L.Ed. 1253 (1932) (following *Soper (No. 1)*); *accord Pennsylvania v. Newcomer,* 618 F.2d 246, 248–49 (3rd Cir.1980); *cf. Virginia v. Rives,* 100 U.S. (10 Otto) 313, 25 L.Ed. 667 (1879) (issuing writ of mandamus to review removal under civil rights removal statute).

The crux of these authorities—that federalism concerns justify review by mandamus—applies directly to the cases before us. California's jurisdiction to try traffic infractions and misdemeanor-manslaughter charges has been "wrested" from it by the district court's orders. There is an argument, however, that the force of these early Supreme Court decisions has been partially deflected by its decision in *Arizona v. Manypenny,* 451 U.S. 232, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981), which, together with authorizing state law, would permit an appeal by the state after an acquittal in federal court if the case was improperly removed to federal court.[5] Thus, mandamus may not be the only procedure whereby California could obtain appellate review of the propriety of the removals.

We find that the limited availability of post-trial review of the removals does not deprive these cases of the exceptional character necessary for mandamus relief. Under *Manypenny* and pertinent state law, California will be able to appeal an acquittal on the grounds that the defendant improperly removed his prosecution to federal court. Yet if the postal workers are convicted in federal court, California will be in an odd position. California could let the convictions stand, but then its asserted right to try the defendants in its own courts would remain unfulfilled. To vindicate this sovereign right, California might appeal the federal court convictions in order to be able to retry the defendants in its own courts. But it would seem perverse to require the state to prosecute in federal court only so it can have its convictions reversed on appeal.[6] Mandamus is appropriate to avoid this awkward result.

Moreover, after the great expenditure of judicial resources necessary to try and acquit a defendant in federal court, an appellate court may well be reluctant to second-guess the district court's decision concerning the often close question of the propriety of removal under the "under color of" requirement. In addition, although the defendant may be said to have brought this situation upon himself by removing to federal court in the first place, the appellate court may nonetheless cautiously approach the prospect of putting him through the ordeal of trial a second time, even if jeopardy technically would not have attached in the federal trial. *See Green v. United*

---

**5.** In determining whether a state can appeal an acquittal in a state prosecution removed to federal court, we look to state law. *See Arizona v. Manypenny,* 451 U.S. 232, 250, 101 S.Ct. 1657, 1669, 68 L.Ed.2d 58 (1981). Under California law, the state can appeal an acquittal if double jeopardy would not bar retrial. *See* Cal.Penal Code § 1238(a)(8) (West 1982). Under both federal and California law, jeopardy does not attach if the trial court lacked subject matter jurisdiction. *See Schlang v. Heard,* 691 F.2d 796, 798 (5th Cir.1982) (applying federal law),

*cert. denied,* 461 U.S. 951, 103 S.Ct. 2419, 77 L.Ed.2d 1310 (1983); *People v. Shanea,* 150 Cal. App.3d 831, 840–44 & n. 12, 198 Cal.Rptr. 228, 233–36 & n. 12 (1984) (applying federal and California law).

**6.** And it would be similarly perverse to expect the defendants to attack their convictions on the ground that federal removal was improper. After all, it is they who now strenuously urge the propriety of the removals.

*States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957). These practical considerations may tend to erode the state's ability to protect its interest in trying defendants in state court. Finally, another argument in favor of mandamus is that the cases raise "new and important problems" and "issues of first impression" that warrant extraordinary treatment. *Harper,* 729 F.2d at 1222.

## III.  REMOVAL

### A.  The Federal Officer Removal Statute and Its History

The removal issue in these cases cannot be properly understood without at least a quick glimpse at the history of the federal officer removal statute, currently codified at 28 U.S.C. § 1442(a)(1).[7] The earliest such removal provision was enacted as part of the federal reaction to New England's opposition to the trade embargo declared during the War of 1812. The statute, which granted customs officials authority to board vessels in order to collect duties, allowed those officials to remove state court civil suits or prosecutions "for any thing done by virtue of this act or under colour thereof." *See* Act of Feb. 4, 1815, § 8, 3 Stat. 195, 198.

Although the 1815 removal provision was of limited duration, Congress enacted a permanent version in 1833 as part of the "Force Bill," enacted in response to South Carolina's Nullification Act—an attempt to make enforcement of federal customs law a state crime. During the 1860's, the "Force Bill" was extended to protect federal officials enforcing the revenue laws in addition to the customs laws. The next development came during the Civil War, when Congress enacted a broad, although temporary, statute allowing removal of civil and criminal cases based on acts justified under the authority of the President or Congress. Finally, in 1948 the statute was broadened further to the language currently contained in 28 U.S.C. § 1442(a)(1).

Several aspects of the federal officer removal statute's pedigree are worth noting. Throughout the statute's history, Congress balanced the perceived federal interests of the time against the states' traditional right to enforce their criminal laws in their own courts. Congress never allowed federal officers—merely because of their federal status—to remove all state court cases in which they were sued or prosecuted. Rather, the right to remove generally came as part and parcel of a larger package of federal substantive law expected to encounter hostility in the state courts. And the federal officers could only remove prosecutions based upon acts done "under color of" their federal authority. The final broadening of the statute in 1948 retained the same "under color of" language present all along, suggesting that a similar balance between state sovereignty and federal interests had been struck, but with application to a wider range of federal substantive law.

### B.  The Scope of the "Under Color of Office" Requirement

The delicate balance between federal and state interests examined in the historical context above comes to the fore in the two cases before us today. Although 28 U.S.C. § 1442(a)(1) has been described as "sweeping" in its breadth, *Hart & Wechsler, supra* note 7, at 1335, and the Supreme Court upheld its constitutionality with broad strokes of federal supremacy, *see Tennessee v. Davis,* 100 U.S. (10 Otto) 257, 263, 25 L.Ed. 648 (1879), no authority binding on this court has ever construed the criminal removal provision as broadly as the district court did in these cases, which implicate no issue of federal law.

The leading Supreme Court decision interpreting the breadth of the criminal removal provision, *Maryland v. Soper (No.*

---

7.  For more detailed discussions of the history of the statute, see *Willingham v. Morgan,* 395 U.S. 402, 405–06, 89 S.Ct. 1813, 1815–16, 23 L.Ed.2d 396 (1969); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System* 1335–38 (2d ed. 1973) [hereinafter *Hart & Wechsler*]; Amsterdam, *Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial,* 113 U.Pa.L.Rev. 793, 805–10 (1965).

*1)*, 270 U.S. 9, 46 S.Ct. 185, 70 L.Ed. 449 (1926), insisted that the federal officers seeking removal demonstrate "a causal connection between what the officer has done under asserted official authority and the state prosecution." *Id.* at 33, 46 S.Ct. at 190. Federal prohibition agents had "discovered a man ... mortally wounded and lying beside the path along which they were walking" during an investigation. *Id.* at 24, 46 S.Ct. at 187. The Court held that the pleadings had not established a sufficient basis for removal of their state murder prosecutions because the "averments amount to hardly more than to say that the [alleged] homicide ... was at a time when they were engaged in performing their official duties." *Id.* at 35, 46 S.Ct. at 191. A proper removal petition would have to allege that "what he did was justified by his duty under the federal law, and [that] he did nothing else on which the prosecution could be based." *Id.* at 34, 46 S.Ct. at 191; *see Colorado v. Symes*, 286 U.S. 510, 519, 52 S.Ct. 635, 637, 76 L.Ed. 1253 (1932).

■ Under the rule of *Soper (No. 1)*, removal of the state criminal prosecutions at bar is inappropriate. The removal petition in *Mesa* alleges only that her allegedly illegal acts "occurred while defendant was on duty and acting in the course and scope of her employment with the Postal Service." Ebrahim alleges that his state charges arose from an accident "which occurred while defendant was on duty." Neither petition shows a sufficient "causal connection" between their duties as mail carriers and the allegedly negligent driving upon which their prosecutions rest. *Cf. Goldfarb v. Muller*, 181 F.Supp. 41, 47 (D.N.J.1959) (denying removal of tort suit against a mail truck driver because there

was no "official connection between the act complained of and [the officer's] official duties").

As in *Soper (No. 1)*, the removal petitions here do not allege that the acts complained of were justified by the officers' duties under federal law. There is no colorable claim that federal immunity [8] protects the officials' acts, as there was when a federal officer received a speeding ticket while hurrying to stage a raid on a suspected illegal still. *See City of Norfolk v. McFarland*, 143 F.Supp. 587 (E.D.Va. 1956).[9] There is no effort on the state's part to criminalize activity important to federal interests, as there was during the War of 1812 and Civil War eras. In short, the prosecutions of Mesa and Ebrahim turn completely on issues of state law. The attenuated federal interest in ensuring that their trial be unbiased does not justify an invasion of the state's authority to police its streets.

The postal workers rely heavily on a more recent Supreme Court decision, *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). In *Willingham*, the Court read the "color of office" provision of 28 U.S.C. § 1442(a)(1) quite broadly in the civil context. Thus it allowed federal prison officials to remove a damage suit brought by a prisoner who alleged that they had physically abused him in a penitentiary. The Court held that the removal petition had established the requisite " 'causal connection,' " which "consist[ed], simply enough, of the undisputed fact that petitioners were on duty, at their place of federal employment, at all the relevant times." *Id.* at 409, 89 S.Ct. at

---

**8.** The doctrine of federal immunity insulates a federal officer from state prosecution if the officer's acts "are both (1) authorized by the laws of the United States and (2) necessary and proper to the execution of his responsibilities." *Morgan v. California*, 743 F.2d 728, 731, 733 (9th Cir.1984) (holding that the defendant had not "demonstrated how it would be necessary and proper for him to drive while under the influence in order to carry out his federal duty of meeting with an informant"); *see In re Neagle*, 135 U.S. 1, 75, 10 S.Ct. 658, 672, 34 L.Ed. 55 (1890).

**9.** Similarly, in *Tennessee v. Davis*, the federal tax collector permitted by the Court to remove his state murder prosecution alleged that his acts of self-defense were done "under the authority of the internal-revenue laws of the United States." 100 U.S. at 261. The Court phrased the question before it as whether article III permitted the removal at issue before trial "when it appears that a Federal question or a claim to a Federal right is raised in the case, and must be decided therein." *Id.* at 262.

1817 (quoting *Soper (No. 1)*, 270 U.S. at 33, 46 S.Ct. at 190).

Citing *Willingham*, the postal workers argue that "on duty" satisfies "under color of office." This argument, however, reads too much into *Willingham*. First of all, the officers in that case had raised a colorable claim of official immunity. *See id.*, 395 U.S. at 405, 409, 89 S.Ct. at 1815, 1817. In fact, Justice Marshall, writing for the Court, noted that "[o]ne of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in the federal courts." *Id.* at 407, 89 S.Ct. at 1816. Here, no federal defense can justify removal.

Second, Justice Marshall drew a sharp distinction between removal in civil cases like *Willingham* and removal of criminal prosecutions: "[w]ere this a criminal case, a more detailed showing might be necessary because of the more compelling state interest in conducting criminal trials in the state courts." *Id.* at 409 n. 4, 89 S.Ct. at 1817 n. 4.[10] Indeed, removal of state criminal prosecutions constitutes a far greater disruption of legitimate state authority than removal of state law civil suits against federal officials.[11] Under the diversity jurisdiction, federal courts have long entertained civil suits turning solely on state substantive law. Furthermore, in criminal suits the state itself is a party; removal

forces the state to enforce its own laws in an alien forum. And finally, a polity's ability to protect its citizens from violence and other breaches of the peace through enforcement of criminal laws is the centermost pillar of sovereignty.[12] Thus, *Willingham*'s broad reading of "under color of office" cannot be casually imported into the criminal arena.[13]

## C. Policy Considerations

The postal workers seek to justify this federal interference with state authority through two policy arguments. First, they cite scattered statements in the case law indicating that besides providing federal officers a federal forum to adjudicate their federal defenses, the federal officer removal provision was designed to permit trial of state-law claims free from local prejudice against federal interests. *See, e.g., Arizona v. Manypenny*, 451 U.S. 232, 241–42, 101 S.Ct. 1657, 1664–65, 68 L.Ed.2d 58 (1981). Although a fear of state court prejudice certainly played a role in the evolution of section 1442(a)(1), the Supreme Court has never indicated that this interest alone would justify removal of a state criminal prosecution. Moreover, this federal interest would be more compelling in the context of civil rights law or some realm of federal authority likely to encounter antagonism in state court. *See generally Strau-*

---

**10.** *See Virginia v. Harvey*, 571 F.Supp. 464 (E.D. Va.1983) (noting *Willingham*'s distinction between civil and criminal removals and holding that driving from one military post to another under orders was not sufficiently connected to an officer's federal duties to warrant removal of his involuntary manslaughter prosecution).

**11.** The dissent seems to disagree, finding it "anomalous" that Congress would provide, in 28 U.S.C. § 1346(b), exclusive federal jurisdiction for tort suits arising from the alleged negligent driving of postal employees, yet would relegate state criminal prosecutions based on the same conduct to state court. *Post*, at p. 968. But 28 U.S.C. § 1346(b) is limited to damage actions "against the United States." Where federal funds are at stake, federal jurisdiction is clearly appropriate. It is no anomaly, then, to deny federal jurisdiction to Mesa and Ebrahim, whose prosecutions do not expose the federal government to potential damage liability.

**12.** *See generally Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971) (dissolving injunction against pending state prosecution because of "the fundamental policy against federal interference with state criminal prosecutions"); *id.* at 55 n. 2, 91 S.Ct. at 757 n. 2 (Stewart, J., concurring) ("A State's decision to classify conduct as criminal provides some indication of the importance it has ascribed to prompt and unencumbered enforcement of its law."); *Colorado v. Symes*, 286 U.S. 510, 518, 52 S.Ct. 635, 637, 76 L.Ed. 1253 (1932); *Oklahoma v. Willingham*, 143 F.Supp. 445, 448 (E.D.Okla. 1956).

**13.** This is where we part company with the Third Circuit, which allowed removal by a federal postal worker under facts indistinguishable from the cases at bar. In *Pennsylvania v. Newcomer*, 618 F.2d 246, 249–50 (3rd Cir.1980), the Third Circuit relied directly on *Willingham*, ignoring the Court's distinction between removal of civil suits and criminal prosecutions.

*der v. West Virginia,* 100 U.S. (10 Otto) 303, 310–12, 25 L.Ed. 664 (1879); 28 U.S.C. § 1443; Amsterdam, *supra* note 7. There is simply no reason to believe that, on a systematic basis, postal workers will not get a fair shake in state court.

The second policy argument set forth in favor of federal removal is a fear "that local officials might use 'petty' offenses such as traffic tickets, trespass or assault charges in a collateral effort to hinder and intimidate federal officials in the performance of their assigned federal duties." This argument assumes, however, that state courts would cooperate with such a ploy by local police. The removal petitions at issue here contain no allegation of a pattern of enforcement discriminating against federal officers, or even of a single prosecution motivated by a desire to frustrate or impede the performance of federal duties. Allegations of this sort would establish a different, and more difficult, case.

Practical considerations militate against construing the removal statute as broadly as the district court did here. Congress could not have intended 28 U.S.C. § 1442(a)(1) to turn the federal courts into a special traffic court for federal employees. Whatever remote federal interests are implicated by state traffic regulation of postal vehicles, the overcrowded district courts do not need a new category of pesky cases turning solely on state law. The cost and inconvenience to the state of enforcing petty traffic infractions (only to receive nominal fines) and driving misdemeanors in federal court may lead them to curtail, or even forgo, prosecution of these offenses when committed by federal postal workers. We do not believe that Congress intended the federal officer removal statute to infringe so drastically upon the states' ability to keep their neighborhood streets safe.

## IV. CONCLUSION

A federal officer's acts performed while on duty are not automatically done "under color of [federal] office." 28 U.S.C. § 1442(a)(1). Because of the states' compelling interest in the administration of their criminal justice systems, we hold that federal postal workers may not remove state criminal prosecutions to federal court when they raise no colorable claim of federal immunity or other federal defense.

A writ of mandamus is hereby GRANTED. The district court is ordered to DENY the petitions for removal and to REMAND these two prosecutions for trial in the California state courts.

NOONAN, Circuit Judge, dissenting:

We are called to interpret an act of Congress. The act provides that "a civil action or a criminal prosecution" brought "against any officer of the United States ... or person acting under him, for any act under color of such office" may be removed by the defendants from the state to the federal court. 62 Stat. 938 (1948), 28 U.S.C. § 1442(a)(1).

The statute embraces not only "officers of the United States" but all their subordinates, officers or not. The head of every federal department or agency is an officer of the United States. Those acting under him are themselves officers or they are employees. Officers or employees, they are within the statute; they are acting under an officer of the United States. All federal employees fall within the class described. Inclusiveness to this degree was the intention of the revisers when the Judicial Code was changed in 1948. The "Reviser's note" declared sweepingly: "The revised subsection (a)(1) is extended to apply to all officers and employees of the United States or any agency thereof." 28 U.S.C. Ann. § 1442, "Historical and Revision Note."

The extent of the change in 1948 rendered superfluous parts of earlier law that were still retained—e.g. 28 U.S.C. § 1442(a)(3) providing for removal of suits against any officer of a court "for any act under color of office or in the performance of his duties." The court officer was already covered by (a)(1). But section (a)(3) was allowed to remain as historical "residue" of a long series of specialized removal statutes that preceded the present (a)(1). See Hart and Wechsler, *The Federal*

*Courts and the Federal System* (ed. Bator, Mishkin, Shapiro and Wechsler, 1972) 1336.

The "breadth of the language," *id.*, makes the phrase "under color of such office" unusually spacious. The phrase "act under color of office" suggests action by an officer of the government. In the context of this statute, the phrase goes further. It necessarily includes—because the statute includes—acts by any employee—a janitor, say, or a guard, or a driver—who would not be classified as an officer. Expansively read as it must be to afford protection to all federal employees, "under color of such office" is the equivalent of "within the scope of their employment."

The statute instructs us that a suit against a federal employee based on an act within the scope of his employment may be removed to a federal forum. No challenge is here raised to the constitutionality of the statute, and none could be. The "judicial Power" of the United States extends to all cases "arising under this Constitution, the laws of the United States ..." Constitution of the United States, Article III, § 2. A case based on the act of a federal employee acting within the scope of his employment arises under the Constitution, which creates the authority to authorize his work, and under the laws of the United States that do authorize it, that make him a federal employee within a federal program with a federal function. Cf. *Osborn v. Bank of the United States*, 9 Wheat. (22 U.S.) 738, 823, 6 L.Ed. 204 (1824).

The history of the removal statute is of course relevant to its reading. Undoubtedly the motivation of Congress in enacting many past provisions for removal was the fear of local hostility to federal policy. See *Maryland v. Soper* (No. 1) 270 U.S. 9, 32, 46 S.Ct. 185, 190, 70 L.Ed. 449 (1926). Congressional motivation should not be mistaken for congressional power. The power exists in Congress to provide a federal forum for all federal agents engaged in federal work. See Mishkin, "The Federal 'Question' in the District Courts", 53 Col.L. Rev. 157, 193 (1953).

Congress has chosen to vest the "judicial Power" in the federal courts to decide suits against federal employees for acts within the scope of their employment. Removal is at the discretion of the employees sued: the case, the statute says, "may" be removed "by them." But if removal is sought by the employee, the acceptance of jurisdiction of the case is mandatory. Congress, not the lower federal courts, determines the jurisdiction of these courts. Constitution of the United States, Article III, § 1. Congress has ordained and established that jurisdiction of such suits against federal employees vests in the federal system.

The removal statute as to civil actions is in harmony with the Federal Tort Claims Act, one of whose "principal purposes was to waive the Government's immunity from liability for injuries resulting from auto accidents in which employees of the Postal Service were at fault." *Kosak v. United States*, 465 U.S. 848, 855, 104 S.Ct. 1519, 1524, 79 L.Ed.2d 860 (1984). Claims against the United States for the negligent acts of postal employees, as of other federal employees, are within the exclusive jurisdiction of the district court. 28 U.S.C. § 1346(b).

It would be anomalous, to say the least, that Congress wanted tort suits arising out of allegations of negligent driving by postal employees tried in the district court but criminal prosecutions based on the same conduct tried in the state courts. A footnote in a recent case does suggest that there is a graver invasion of state sovereignty when a state is denied the right to prosecute a state crime in a state court. *Willingham v. Morgan*, 395 U.S. 402 at 409, n. 4, 89 S.Ct. 1813 at 1817, n. 4. This suggestion was answered long ago: a portion of state sovereignty was surrendered, when the Union was formed, to the United States. It is no derogation of any existing state sovereignty when the national government exercises its own authority to create a federal forum in which the acts of its agents will be measured. *Tennessee v. Davis*, 100 U.S. (10 Otto) 257, 267, 25 L.Ed. 648 (1880). In the removal statute Congress has made no differentiation between "civil actions" and "criminal prosecutions."

In the same breath, Congress has provided for the removal of both. A court should not distinguish where Congress in the exercise of its constitutional power has drawn no line.

It is not a requirement for removal that the employee have a federal defense to the charges. Language in some cases does suggest that there must be such a defense. *Maryland v. Soper* (No. 1) 270 U.S. at 33–34, 46 S.Ct. at 190–191; cf. *Arizona v. Manypenny*, 451 U.S. 232, 241, 101 S.Ct. 1657, 1664, 68 L.Ed.2d 58 (1981). But this cannot be right. If there were such a requirement, the only federal employees entitled to removal would be those who had committed a crime under state law and had a federal justification or immunity as an affirmative defense. The federal employee charged with a crime for an act done in the course of his employment and entirely innocent of any unlawful act whatsoever has no "federal defense." His defense is, "I did not do the unlawful act complained of." The removal statute reflects no intention on the part of Congress to deny such an entirely innocent federal employee the benefit of a federal forum.

Kathryn Mesa is similarly entitled to the removal of her case to the federal forum. The state of California has charged her with vehicular manslaughter in an automobile accident. In her petition for removal she has declared that "the state charges arose from an accident involving defendant which occurred while defendant was on duty and acting in the course and scope of her employment with the Postal Service." She has stated—rather skimpily to be sure—the essential facts necessary to support removal.

No doubt it would have been better practice to put in her petition what the United States Attorney did put in his brief to the trial court: that on August 16, 1985, at 3:20 p.m., Mesa, a postal employee, was driving her postal jeep to reach her assigned mail route when she moved to make a U-turn from the far left lane; that her entry into that lane was blocked by a truck; and that failing to enter that lane, she collided with a bicyclist who had "drifted over" into the middle lane; they collided, and the boy was killed. Such a narrative would have better complied with the requirements of 28 U.S.C. § 1446(a) that a removal petitioner make "a short and plain statement of the facts which entitle him to removal." See *Willingham*, 395 U.S. at 407, n. 3, 89 S.Ct. at 1816, n. 3. But Mesa should not be prejudiced because the United States Attorney representing her put in the brief what he should have put in the petition. The essential issue is clear. Mesa killed someone as, on duty, she drove a mail jeep. She was a federal employee. She was within the scope of her federal employment. She is entitled to have a federal court decide whether she killed unlawfully.

She asserts no federal defense in the sense of asserting that a mail truck driver has a license to kill bicyclists. In this respect she is like the warden and doctor in *Willingham*. Her substantive defense is assertion of innocence of the acts alleged. Her federal "defense" in the sense of *Willingham* is that she was driving her vehicle on duty. She was within the scope of her federal employment—unquestionably, as the facts stated in her petition are not denied. Her guilt of the crime charged, of which she pleads innocent, must be established, on her demand, in a federal court.

The opinion of the court create a split within the circuits. *Pennsylvania v. Newcomer*, 618 F.2d 246 (3rd Cir.1980). For that reason alone, on a matter of this kind, we might well hesitate to reach the result the court reaches. The result is far from being required by any binding precedent. The court reads *Soper* in a broad and binding way and *Willingham* in a narrow and literal way: that is at the nub of the decision of the court as far as precedents go. The opinion also invokes *Morgan v. California*, 743 F.2d 728, 731 (9th Cir.1984). But that case dealt with the immunity of federal officers, not removal jurisdiction. The opinion in citing this case is consistent with its theory that only a defense based on federal immunity or justification will warrant removal. Finally, the opinion brings forward a policy consideration, that federal district courts should not be made traffic courts. This concern is needless.

The broad removal statute for federal employees has been on the books about 30 years without such a catastrophe. Many federal employee defendants must prefer the informality of a municipal proceeding to federal formality. The United States District Attorney, who defends such suits, and the Postal Service, which is indirectly involved in them, are able to exercise a restraining influence on defendants who foolishly desire removal. To halt a small but useful flow of federal business by a constriction of a statutory channel is unnecessary judicial housekeeping and contrary to the congressional command.

I would affirm.

For the same reasons I dissent in the case now consolidated with this one, *California v. Ebrahim,* No. 85–1500.